veyed it to E. G. Heaton, who was the owner at the time of the appropriation. After the appropriation, but before the filing of the claim, Lester had executed a bill of sale to Moroney. From the date of the lease to the date of the appropriation, but before the filing of the claim, Lester and Moroney, as copartners, or Moroney, alone, were in possession and paid a monthly rent of $6.25, this amount being paid for a period of time to E. G. Heaton, who disputes the lease and claim of Moroney. The entire property was appropriated by the state and the owner made a settlement with the state appraiser the amount of which has not been paid. The owner has not filed a claim in this court, was not made a party to the present claim, and has not consented to have any issues between himself and the claimant determined by the court.

The state's settlement with the owner includes an adjustment of all of the damages for the appropriation of the property, and out of the amount agreed upon, in the absence of any agreement to the contrary, must come all of the liens and incumbrances against the property. The lease is an incumbrance (Forster v. Scott, 136 N. Y. 577, 32 N. E. 976, 18 L. R. A. 543), and, unless there was some fraud or misrepresentation or misunderstanding when the agreement was made with the state appraiser, the value of the leasehold interest must come out of the amount agreed to be paid to the owner. A situation like this is provided for in the canal law (Consol. Laws, c. 5, § 88), which says that:

"When damages are awarded for the appropriation of any lands or waters to the use of the canal and it appears that there is any lien or incumbrance on the property so appropriated, the comptroller may deposit the amount awarded in any bank in which moneys belonging to such account may be deposited to the account of such award, to be distributed to the persons entitled to the same on an application to the Supreme Court of any person."

The claim should be dismissed and the claimant remanded to his remedy against the fund created by the agreement between the owner and the state which takes the place of the property appropriated and out of which any liens and incumbrances must be paid (Matter of New York, W. S. & B. R. R. Co., 35 Hun, 633; Matter of City of New York, 120 App. Div. 700, 105 N. Y. Supp. 779), unless the owner is brought into court as a party to this proceeding, and consents to have the interests of the claimant determined by this court (Anderson v. v. Reilly, 66 N. Y. 189).

SWIFT and MURRAY, JJ., concur.

---

(67 Misc. Rep. 660.)

### In re MILLER'S WILL.

(Surrogate's Court, Kings County. May, 1910.)

DEATH (§ 4*)—EVIDENCE—DISAPPEARANCE IN FACE OF FATAL DANGER.

　　Though the unexplained disappearance of a man is not a sufficient foundation for the presumption of his death, yet where the testator in a stormy night attempted to reach a houseboat in which he lived. and the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

evidence tended to show that he was drowned in the effort, and that his body was carried out to sea and he was never seen after such time, it justified a finding of death.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 516; Dec. Dig. § 4.*]

In the matter of the probate of the last will of Frederick W. Miller. Probate decreed.

James C. Cropsey, for proponent.
Foley & Powell (Henry A. Powell, of counsel), for contestants.
William S. Butler, special guardian.

KETCHAM, S. The issue is whether or not the testator died on or about the 30th day of April, 1908.

At that time he owned a houseboat, kept at Rockaway Park, in Jamaica Bay, moored off the pier of a boatman who was engaged in hiring and keeping boats. The testator for a few weeks prior to the day mentioned was in the habit "pretty nearly every day" of going from Brooklyn to Rockaway Park and sleeping aboard his boat. On the morning of the 30th of April he was working on his boat, and then, according to his wont, left aboard of her a dog of which he was fond. A scow belonging to the boatman lay inshore from the testator's boat. Access to the scow could ordinarily be had by planks reaching from the shore to the scow. The night of April 30th was stormy, with unusually high tide, high wind, and heavy rain. The tide had turned about 8 o'clock and was running out, and the wind was offshore and coincided with the ebb tide. The distance from the scow to the houseboat was about 80 feet, and the depth of water at the houseboat was about four feet. On the following morning it was found that the planks usually in position between the shore and the scow had been under water, and that other planks had been placed so that a person could have walked right from them onto the scow. The testator reached Rockaway Park on the evening in question by train, arriving at about 9 o'clock. The station was about 400 feet from the scow above referred to. The testator was last seen proceeding in the direction of the scow. He had rubber boots, and at ordinary tide walked right out to his boat. There is evidence that the testator intended to go to his boat, for when a friend said to him, "It is raining pretty hard. You had better be careful when you go to the houseboat," he put up his hand and said, "That is all right," and walked away.

There is evidence that he made the attempt to reach his boat, for a pair of trousers, well proven to have been his, were found the next morning hanging upon a nail in a closet on the boatman's scow. In these trousers were found about $22 in money and a bunch of keys belonging to the testator. It is stated that he was intoxicated on the evening in question, but to what degree does not appear. No evidence is given of his existence after that night. The testator left a considerable estate, both real and personal. These facts justify belief that the testator endeavored to put off from the scow to his boat and was drowned in the effort, and that his body was carried to sea.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

It must be remarked that among the keys found the next morning, as described, was one which opened the testator's houseboat, and that without its use he could not have obtained access to its interior; but, so far as this fact is inconsistent with the theory above expressed, it is overcome by the many other suggestions of the evidence and may be ascribed to testator's condition and forgetfulness.

The rules applicable to unexplained disappearances have no relation to a disappearance in the face of a fatal danger. Where one has vanished from the view of his associates without any intimation of the reason or manner of his departure, it is held that there is no presumption of death sufficient alone to constrain a finding. Matter of Board of Education of New York, 173 N. Y. 321, 66 N. E. 11; Dunn v. Travis, 56 App. Div. 317, 67 N. Y. Supp. 743. But the reasoning of these cases would have little influence where a person, when last seen, was going into battle or falling from a ship in a storm. The circumstances surrounding the testator when last seen were such as to justify the conclusion that he died from the normal and usual development of circumstances then in process, and there can be no more need or room for further inquiry than there is in the case of ordinary death in the sight of numerous witnesses.

The will is admitted to probate.

Probate decreed.